Henry Schroeder, as Administrator of the Estate of John Schroeder, Deceased, Appellant, v. The Chicago & North Western Railway Company.

**Railroads: NEGLIGENCE: EVIDENCE.** Evidence that blocked switch
1  frogs are common safety devices is material in an action for injuries alleged to have resulted from an unblocked frog.

**Competency of witness.** A witness of fifteen years' experience in
2  working over switch frogs and in various other capacities incident to railway service is competent to state whether blocked switch frogs are common safety devices.

**Expert evidence.** The question of whether an unblocked switch
3  frog is dangerous is the subject of expert testimony.

**Assumption of risk: NEGLIGENCE.** Where the evidence relative to
4  assumption of risk or contributory negligence presents debatable issues they are for the jury to decide.

**Personal injury: DEATH: EVIDENCE.** In an action for the death of
5  an employé, the evidence is reviewed and held to require a submission to the jury of the question as to whether plaintiff's death resulted from his injuries.

*Appeal from Boone District Court.*— Hon. W. D. Evans, Judge.

Wednesday, June 14, 1905.

ACTION for damages resulted in a directed verdict for defendant, upon which judgment was entered. The plaintiff appeals.— *Reversed.*

*Ganoe & Hollingsworth,* for appellant.

*James C. Davis, Clark & McLaughlin,* and *Stevens & Fry,* for appellee.

LADD, J.— The defendant's roundhouse is semicircular, with a track leading to each stall from a turntable in the center. When engines are brought in for repair, their wheels are sometimes removed and taken over this table to the shop to be tightened, and then returned. On the afternoon of November 25, 1901, the deceased, John Schroeder, and five others were engaged in rolling a pair of engine wheels, attached to an axle, back to a stall, under the direction of one Higgins, the erecting foreman of the shops. The wheels, after passing over the table, " slued off the rails " (that is, one wheel got a little in advance of the other), and, at Higgins' direction, were backed on the track a few feet, until the counterbalances were down, with the view of wedging one and bringing the other into position on the rail (that is, of squaring the wheels on the rails) by the use of a pinch bar. Schroeder, with three others, was on the side toward the table, and as he stepped back his foot was caught between the rails approaching the table from adjoining stalls as they neared the frog made use of in such intersections, and the wheel rolled over the left foot and bruised the right knee. One witness thought that, had he been in an upright position, his shoe would not have caught, while another declared that it was held fast. Several grounds of negligence were alleged by the plaintiff, but the only one the evidence tended to prove was that defendant omitted to block the frogs. It made use of a cast frog, which included the point and the ends of the two rails of an ordinary frog. The diverging rails running from the stalls of the roundhouse came to this point, and no

blocks had been placed between these rails. A witness described the block of a frog as " a block of wedge-shaped wood driven in the point where the two rails came together, and extending back about 18 inches from the point, to keep the foot from running in and being caught." According to *Southern Pacific R. Co. v. Seley,* 152 U. S. 145 (14 Sup. Ct. 530, 38 L. Ed. 391), this was accurate. These frogs were about 60 feet from the stalls, and 20 feet from the turntable. The evidence tended to show that employés passed over this portion of the yard frequently, and that the rolling of wheels in and out of the roundhouse by way of the table was of daily occurrence.

The witness giving the above definition had worked over the unblocked frogs for fifteen years; had been in the roustabout gang, on the gravel train, breaking on the road, and in the tinshop. He was asked, " Were blocked switch frogs common safety devices known to railroad men ? " This was objected to as " leading, immaterial, irrelevant, not involved in this accident." The objection was sustained. This was error.

1. Railroads: negligence; evidence.

It is said the competency of the witness was not shown. That objection was not urged, but, even if it had been, the character of his employment was such, at least part of the time, as to qualify him to answer. It is also suggested that decedent's foot was not caught in a switch frog, but this is a mere quibble on words, as the witness had just designated those in the yard as " switch frogs," so that what was intended was manifest. Assuming, as we must, that the answer would have been favorable to plaintiff, it would have tended to show that blocks, the omission of which was the ground of the negligence charged, were the safety appliance commonly in use by railroad men.

2. Competency of Witness.

The same witness was asked:  " What do you say as to switch frogs being dangerous, or not, when unblocked ? " This was objected to as " incompetent, immaterial, and irrele-

vant, and not matter of expert testimony," and the objection
was sustained. None of these objections are
tenable, unless the last; and, if that is not
sound, the defendant's contention that there was " no evidence
that such places are ordinarily dangerous without blocking,
and no evidence that the same would be safer with," is un-
founded, for the situation was fully proven. We think this a
matter concerning which men not experienced in the operation
of a railroad would be unlikely to be informed, and that the
answer should have been received. Again, it is said that,
even if blocked, the filling would extend but 18 inches from
the point, and decedent's foot was caught 18 to 24 inches
back. The witnesses merely estimate that distance as about
so far. From the very nature of the contrivance, the dis-
tance it should extend from the point necessarily depends
on the angle of the rails. If to prevent the foot from being
caught, it must extend as far as the rails are close enough
to catch the foot. We are of the opinion that, had the ques-
tions been allowed, and favorably answered, as we must pre-
sume they would have been, the issue as to the negligence
on the part of defendant would have been for the jury to
determine.

*3. EXPERT EVIDENCE.*

II. The appellee insists that the evidence showed con-
clusively that deceased had assumed the risk, and, in any
event, was guilty of contributory negligence. As these con-
tentions are based on the same evidence, they
may be considered together. He had worked
with the " roustabout gang " about two months
— some of the time within the circle before the roundhouse.
From there he entered the paintshop, and was engaged in
painting box cars beyond the roundhouse, looking from the
turntable, but the shop opened toward it. In going from
the shop to the checkroom, the men sometimes passed over
the tracks and frogs, but it was their custom to follow a path
in the roundhouse back of the engines. About three weeks
before the accident he became a machinist's helper, and it

*4. ASSUMPTION OF RISK: negligence.*

was the duty of a helper to assist in rolling the engine wheels whenever called upon so to do. These were rolled daily, but no witness testified to having seen him assist prior to the time of the accident. For all that appears, he may not have worked at or been over the frogs before that day, and then he had the right to assume that the place was reasonably safe for the performance of his duties. The accident occurred in the daytime, and, had he looked, he could have seen that there were no blockings between the rails. But he is not shown to have gone over the frogs, except when, with others, he was pushing these wheels, each of which was 5 or 6 feet in diameter, and weighed about 4,000 pounds. In these circumstances, it cannot be assumed that he knew or ought necessarily to have known of the condition of the frogs. He may not have been near them until the afternoon in question, and his work then was not such as that he must have appreciated the danger of his situation. When the foreman ordered that the wheel be rolled back, it was but natural that plaintiff, who had been pushing, should step back as it came toward him. Of course, he might have stepped to one side, and doubtless would have done so, had he appreciated the danger. That one hurt in an accident might have acted differently is precisely what raises an issue of fact for the jury, and unless it conclusively appears that, in the exercise of ordinary prudence, he should have done so, he ought not to be held, as a matter of law, to have been guilty of negligence contributing to his own injury. Each of these issues, being fairly debatable, was for the jury and not the court to decide.

III. The main controversy is whether the evidence was such as to indicate that death resulted from the injuries received. The skin was not broken at the ankle or knee, but both swelled immediately, and a blue spot as big as a dollar appeared on the former, and one the size of a half dollar on each side of the latter. The knee joint became stiff. When the swelling

5. PERSONAL INJURY: death; evidence.

went down, both continued discolored, and he complained of
pain in each up to the time of his death, nine and one-half
months thereafter. He also complained of his heart shortly
after the accident, and trouble in breathing, and spit blood,
as he did several times afterwards. He was confined to his
bed till Christmas, after which he sat up several hours each
day, and sometimes all day. In January there was a break-
ing at the ankle, and suppuration and " black blood " came
therefrom. Suppuration continued until three weeks prior
to his death, when a thin, bluish skin covered the wound. In
February the physician made an incision and scraped the
bone. In April the pain over the heart became intense, and
his breathing difficult. From then until the middle of June
he was confined to his bed, and thereafter began to ride out.
Later he walked about on crutches, and on Labor Day — the
first Monday in September — he walked down town by the
use of a cane, though he never stepped on the heel. He
often suffered from pain in the side and back, and com-
plained of pain over the heart, and trouble in breathing,
during the entire period.

The only testimony relating to his temperature was
that of his father, who said he did not know whether he had
any fever or not; that he saw the doctor taking his tempera-
ture, but did not ask what it was. One witness testified
that he kept getting worse until he died, on September 9,
1902, but the attending circumstances of that event are not
disclosed in the record. He was twenty years old, had been
healthy during the preceding four years, but had suffered
from an attack of inflammatory rheumatism for six weeks
some eight years previous to the accident, since which time
his feet had troubled him when standing a considerable time;
having loose swellings or corns on the soles. Two physi-
cians on the part of defendant, in answer to hypothetical
questions fairly stating the facts as recited above, save in
assuming there was no rise in temperature, expressed opin-
ions that death could not have resulted from the accident.

On the other hand, one of the physicians called by plaintiff testified, in answer to similar inquiries, that infection resulted from the condition of the ankle, which, " continuing the length of time it did, would weaken the heart, by absorbing toxic products produced by the infection," and " would produce a weakening of the whole constitution," though not necessarily in all cases; and the other expressed the opinion that the heart trouble and an infection of the blood resulted from the injury; that " the affected material would probably be absorbed by the circulation and cause secondary endocarditis "; that an attack of rheumatism often leaves the heart weak; that " we look for endocarditis when we have an infection anywhere "; that endocarditis is an inflammation of the heart lining, and interferes with the action of that organ so as to enlarge or cause leakage of the valves, and make it beat faster. The doctors agreed that this disease results from general infection, attended by a rise of temperature; and one of those called by defendant was of opinion that a person will die in a few days from acute endocarditis, but may survive months or years with the disease when chronic.

The evidence as to the cause of death is not satisfactory, but, in the absence of any other explanation, we think it such that the jury might have attributed it to the injury received. The conditions present, according to all the physicians, were such that they might have produced the disease known as " endocarditis," and the only symptom of that lacking was high temperature, which, for all that appears, may have existed. According to one of them, it is reasonably probable that such disease resulted therefrom. It was shown to be a fatal disease. Certainly the evidence of his condition, in connection with the opinions of the experts, furnished a reasonable and probable explanation of the cause which occasioned his death; and, in the absence of some other, the court ought not to say that the jury might not fairly have found that the injury and consequences thereof ended

his life. We conclude that a case was made out for the jury, and that the court erred in directing a verdict for the defendant.

Exception is taken to appellant's brief. It was in substantial compliance with the rules of this court, and that is all that should be exacted.— *Reversed.*